IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PEGGY CARLSON,<br><br>    Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN,<br><br>    Defendant. | MEMORANDUM DECISION AND ORDER<br><br>Case No.  2:11-CV-00386-EJF<br><br>Magistrate Judge Evelyn J. Furse |

  Plaintiff Peggy L. Carlson filed this action asking the Court to reverse the final agency decision denying her application for Supplemental Security Income, ("SSI"), under Title XVI Social Security Act, *see* 42 U.S.C §§ 1381-1383f (2010).  Pursuant to Civil Rule 7-1(f) of the United States District Court for the District of Utah Rules of Practice, the Court elects to determine the motion on the basis of written memoranda and finds oral argument unnecessary. *See* DUCivR 7-1(f).  Based on the analysis set forth below, the Court REMANDS for further findings as to whether or not Ms. Carlson's alleged disabilities meet or equal a Listing.

## FACTUAL AND PROCEDURAL HISTORY

  In June 2008, Ms. Carlson filed for SSI, alleging an onset date of disability of January 25, 2006.  (Tr. 116-119.)  The Social Security Administration denied Plaintiff's claim on September 23, 2008, and she requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. 63-66, 67.)  The hearing took place on February 4, 2010, and during the ALJ hearing Plaintiff amended her alleged onset date to June 7, 2008.  (Tr. 12.)  On April 22, 2010, the ALJ issued a decision finding Plaintiff did not qualify as disabled under the Social Security Act.  (Tr. 12.)  On May 21, 2010, Plaintiff appealed that decision, (Tr. 113-14), and on March 4, 2011 the Appeals Council denied Plaintiff's request for review, (Tr. 1-3), making the ALJ's decision the Commissioner's

final decision for purposes of judicial review under 42 U.S.C. § 405(g).  *See* 20 C.F.R. § 404.981.

At the time of the ALJ hearing, Ms. Carlson was in her early thirties, married, and caring for nine children.  (Tr. 259.)  Ms. Carlson alleged she had bipolar disorder and that her mental symptoms along with her migraines, obesity, and borderline mental functionality disabled her to the point of not being able to obtain full-time work.  (Tr. 29-34.)

On June 4, 2008, Ms. Carlson visited Jessica Judy—a nurse practitioner.  (Tr. 182-83.)  Nurse Judy found Ms. Carlson to have a "mood disorder" and occasional migraine headaches, and gave prescriptions for both.  (*Id*.)  Nurse Judy had Ms. Carlson fill out a mood disorder questionnaire and after reviewing this Nurse Judy noted that "it does lean toward the fact that she is bipolar" but that "definitive diagnosis from a psychiatric professional" was still needed.  (Tr. 182).  On June 17, 2008, Ms. Carlson saw Nurse Judy for the second and final time, and the only diagnosis was a "mood disorder."  (Tr. 181.)  Nurse Judy wrote that Ms. Carlson "had been suffering from symptoms of depression that almost sounded like she was bipolar or possibly could have been bipolar," but Nurse Judy did not diagnose Ms. Carlson as bipolar.  (Tr. 181.)

Ms. Carlson next saw Dr. Barbara Halazon, Ph.D., for a psychological evaluation in August 2008.  (Tr. 184).  After completing the psychological evaluation, including hearing Ms. Carlson's statements about her own attempts to jump out of moving vehicles "a few years ago,"[1] Dr. Halazon diagnosed Ms. Carlson on Axis I with a mood disorder, NOS, and on Axis II with a personality disorder, NOS.  (Tr. 190.)  Dr. Halazon also stated that Ms. Carlson's "[p]ast medical history is significant for … possible bipolar disorder," however, Dr. Halazon did not diagnose

---

[1] During this evaluation, Ms. Carlson also disclosed that in 2007 she had left her family at the request of her husband because she had hit her son.  (Tr. 184.)

2

Ms. Carlson as bipolar. (Tr. 189-90). Dr. Halazon noted that Ms. Carlson reported "severe migraines several times a month," which Ms. Carlson treated with Imitrex[2] as needed. (Tr. 188.)

In September 2008, Ms. Carlson returned to Dr. Halazon for a psychometric evaluation. (Tr. 191.) Dr. Halazon noted that Ms. Carlson "is a fast and steady worker … quite motivated." (Tr. 192.) After Dr. Halazon administered a few tests, she determined that Ms. Carlson had an IQ of 76 and diagnosed "borderline intellectual functioning." (Tr. 192-93.)

Also in September 2008, Dr. Ron Marshall, Ph.D., a DDS[3] medical consultant, conducted a Mental Residual Functional Capacity Assessment on Ms. Carlson. (Tr. 194-211.) Dr. Marshall noted that Ms. Carlson's impairments were "severe but not expected to last 12 months" and that Ms. Carlson had no episodes of decomposition of extended durations. (Tr. 198, 208.) Dr. Marshall also noted that Ms. Carlson is "[a]ble to care for personal needs," though she "needs reminders to take meds, sometimes refuses to take meds." (Tr. 210.) Ms. Carlson, according to Dr. Marshall, is also "[a]ble to make very simple meals and able to do HH chores but doesn't do many chores." *Id*.

A September 2008 DDS Disability Worksheet notes that Ms. Carlson's husband called the DDS and reported that a week prior Ms. Carlson had simply "left the house for 2 days (she went to her parents)" and that she will sometimes "play games on the internet for hrs and not get anything done at home." (Tr. 213.)

In early October 2008, Ms. Carlson held a knife to her husband's throat. (Tr. 229.) The state charged her with domestic violence but released her, pending trial. *Id*. The Court ordered Ms. Carlson to participate in therapy. (Tr. 227.) Patty Webber, APRN, BC—employed by Northpointe Behavioral Healthcare—wrote the treatments notes and lists Dr. John R. Groeneveld

---

[2] Nurse Judy prescribed Imitrex to Ms. Carlson. (Tr. 183).
[3] DDS is short for Disability Determination Service.

M.D. as the primary doctor.  (Tr. 224, 228.)  In February of 2009 Dr. Groeneveld penned a letter that Ms. Carlson has "a history of bipolar disorder which was diagnosed with[in] the past year and treatment has begun within the year. … At the present time, I do not feel that she is able to work at her regular job."  (Tr. 215.)  The record does not include any treatment notes taken by Dr. Groeneveld, nor does it show if, when, or who officially diagnosed Plaintiff with bipolar disorder or how prior to the writing of this letter.

Treatment notes from Northpointe Behavior Healthcare indicate that Ms. Carlson does not drive or work because her husband "will not let her."  (Tr. 229.)  These notes also indicate that Ms. Carlson reported that she had not held a job since she married her husband because he believed his wife "should not work."  (Tr. 230.)  By the end of March 2009 Ms. Carlson had improved and stabilized on her medication.  (Tr. 220-21.)

In spring 2009, Ms. Carlson moved back to Utah.  (Tr. 217.)  In August 2009, Ms. Carlson also saw Southwest Center Behavioral Health, ("Center"), therapist Roger Kay Lister, LCSW, (Tr. 243), who diagnosed Ms. Carlson with bipolar disorder, and borderline personality disorder.  (Tr. 259.)  On September 23, 2009, Mr. Lister diagnosed Ms. Carlson with intermittent explosive disorder.  (*Id*.)  Also, on September 23, 2009, Ryan Williams, M.D., from the Center examined Ms. Carlson.  (Tr. 254.)

After the examination, Dr. Williams wrote that "[f]rom a diagnostic standpoint I do not see any clear reason for a diagnosis of bipolar disorder as her symptoms do fit within a borderline personality spectrum.  She has not had any clear cut manic episodes.  Consequently I will negate the bipolar diagnosis until a manic episode does occur."  (Tr. 253.)  Dr. Williams diagnosed Ms. Carlson with intermittent explosive disorder and borderline personality disorder.  (Tr. 252.)

At some point between August 2009 and February 2010, Mr. Lister drafted a brief overview of Ms. Carlson's treatment at the center.[4]  (Tr. 298-99.)  In this report, Mr. Lister diagnosed Ms. Carlson as suffering from "Bipolar Disorder I, Most Recent Episode Unspecified," "Intermittent Explosive Disorder," and "Borderline Personality Disorder."  (Tr. 298.)  Mr. Lister stated that though Ms. Carlson had responded "in a positive manner" to weekly therapy and medications, her progress "depends on continuing cooperation with therapy and medication compliance."  (Tr. 299.)  Mr. Lister wrote that he believed Ms. Carlson was unable to maintain a full-time job.  *Id*.

On February 2, 2010, two days before the ALJ hearing, psychologist Dr. James Ottesen reviewed Ms. Carlson's medical record.  (Tr. 273-294.)  Dr. Ottesen ultimately diagnosed borderline intellectual functioning, bipolar disorder, and borderline personality disorder—Dr. Ottesen never met personally with Ms. Carlson.  *Id*.

## **STANDARD OF REVIEW**

42 U.S.C. § 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision to determine whether the record as a whole contains substantial evidence in support of the Commissioner's factual findings and whether the SSA applied the correct legal standards.  42 U.S.C. §405(g) (2010); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's findings shall stand if supported by substantial evidence.  42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly

---

[4] The only date on the report—pertaining to the date of the report's creation—is the date the report was faxed, and so the report had to have been completed sometime after Plaintiff first met Mr. Lister and before the February 3, 2010 fax date.

contradicted by other evidence." *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994). The standard "requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. "Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotations marks and citations omitted). Moreover, "[a] finding of 'no substantial evidence' will be found only where there is a conspicuous absence of credible choices or no contrary medical evidence." *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of law that must be followed in weighing particular types of evidence in disability cases," the court "will not reweigh the evidence or substitute [its] judgment for the Commissioner's." *Lax*, 489 F.3d at 1084 (internal quotation marks and citations omitted). The court will "review only the *sufficiency* of the evidence." *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007) (emphasis in original). The court does not have to accept the Commissioner's findings mechanically, but "examine the record as a whole, including whatever in the record fairly detracts from the weight of the [Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the

matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (*quoting Zoltanksi v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards or the Commissioner fails to demonstrate reliance on the correct legal standards. *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thomson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation. *See* 20 C.F.R. § 404.1520; *Williams v. Bowen*, 844 F.2d 748, 750-53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and

    (5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520. The claimant has the initial burden of establishing the disability in the first four steps. *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989). At step five, the burden shifts to the Commissioner to show that the claimant retains the ability to perform other work existing in the national economy. *Id.*

    The ALJ continued to evaluate Ms. Carlson's claim through step five, making the following findings of fact and conclusions of law with respect to Plaintiff:

1. "[Ms. Carlson] has not engaged in substantial gainful activity since June 7, 2008, the application date (20 CFR 416.971 *et seq*.)." (Tr. 14.)
2. "[Ms. Carlson] has the following severe impairments: borderline intellectual functioning (e.g., see Ex. 3F, pg. 7); mood disorder (e.g., see Ex. 3F, pg. 7); personality disorder (e.g., see Ex. 3F, pg. 7); and, obesity (e.g., see Ex. 10F, pg. 10)(20 CFR 416.920(c))." (Tr. 14.)
3. "[Ms. Carlson] does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926)." (Tr. 14.)
4. "[D]uring the relevant time period, [Ms. Carlson] had the residual functional capacity to perform the full range of sedentary, unskilled work, as defined in 20 CFR 416.967(c), except that such work could not require: bending, stooping, twisting or squatting on more than a 'less than occasional' basis; work on the floor…on more than a 'less than occasional' basis; climbing flight(s) of stairs (a few steps up or down not precluded); work at more than a low stress level…work at more than a low concentration level, which means the ability to be alert and attentive to (and to perform) only unskilled work tasks; and, work at more than a low memory level…" (Tr. 16.)
5. "[Ms. Carlson] has no past relevant work (20 CFR 416.965)." (Tr. 22.)
6. "[Ms. Carlson] was born on June 23, 1977 and was 30 years old, which is defined as a younger individual age 18-44, on the date the application was filed (20 CFR 416.963)." (Tr. 23.)
7. "[Ms. Carlson] has a limited education (11th grade) and is able to communicate in English." (Tr. 23.)
8. "Transferability of job skills in not an issue because [Ms. Carlson] does not have past relevant work (20 CFR 416.968)." (Tr. 23.)

> 9. "Considering [Ms. Carlson's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Ms. Carlson] can perform (20 CFR 416.969 and 416.969(a))." (Tr. 23.)
> 10. "[Ms. Carlson} has not been under a disability, as defined in the Social Security Act, since June 7, 2008, the date the application was filed (20 CFR 416.920(g))." (Tr. 24.)

In short, the ALJ concluded that Ms. Carlson did not possess an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, that Ms. Carlson had the residual capacity to perform the full range of sedentary, unskilled work, and did not qualify as disabled as defined in the Social Security Act from June 7, 2008, the alleged onset date, through the date of the ALJ decision. (Tr. 14, 16, 24.)

In support of her claim that this Court should reverse the Commissioner's decision, Ms. Carlson argues the ALJ erred: (I) by failing to evaluate properly whether Ms. Carlson's mental impairments meet or equal a listing; (II) by failing to evaluate properly the medical opinion evidence in the record; (III) by failing to consider the lay opinions in the record; (IV) by failing to include all Ms. Carlson's established limitations in the residual functional capacity assessment. Since the Court concludes that the ALJ must make further findings concerning whether or not Ms. Carlson's impairments meet or equal a listing, the Court will not address the remaining issues.

### I. The ALJ's Opinion Lacks Analysis of Paragraph A of Listing 12.04 and Paragraph A of Listing 12.08.

Ms. Carlson would qualify for benefits if her impairments meet or equal a Listing set forth in the regulations. 20 C.F.R § 404.1520(d). Ms. Carlson argues she meets Listings 12.04 and 12.08 from appendix 1 to the regulations. (Pl. Op. Br. 9.) Plaintiff largely rests her argument on the findings of Dr. Ottesen, findings that the ALJ gave "little weight." (Pl. Op. Br.

9-12; Tr. 22.) Ssubstantial evidence in the record supports the ALJ's finding that Dr. Ottesen's opinions should receive "little weight." (*See* Tr. 22.)

First, despite ample room for comments on the forms Dr. Ottesen used, he gave practically no explanation of his findings. (Tr. 21-22; Tr. 273-95.) When a reviewing physician's opinions suggest greater disability than do the notes of medical providers who actually examined a claimant, the ALJ can reasonably expect the reviewing physician to give some sort of foundation for his opinion—otherwise, the ALJ may give the opinion little weight. *See Sharfarz v. Bowen,* 825 F.2d 278, 280 (11th Cir.1987) ("The opinions of nonexamining, reviewing physicians, ... when contrary to those of examining physicians, are entitled to little weight, and standing alone do not constitute substantial evidence.") (citations omitted.) For example, Dr. Ottesen noted that Plaintiff had at least three episodes of decompensation, (Tr. 284), but neither Dr. Ottesen nor the Plaintiff point to the record to show when these episodes occurred—this opinion goes beyond those of the other medical providers because no other provider listed any episodes of decompensation.

Second, at the ALJ hearing Plaintiff's counsel conceded that, at least in one area, Dr. Ottesen's findings were "a little bit vague." (Tr. 29.)

Third, the ALJ noted that Dr. Ottesen's opinions contradicted some accounts of Plaintiff's activities of daily living—activities that involved mowing the lawn once a week, cleaning and laundry for "3 to 4 [hours] every day," caring for her nine children, exercising, helping with a yard sale, going to Home Depot and Wal-Mart, and playing on the computer for several hours a day multiple days a week. (Tr. 20, 144-145, 148, 152-154, 187.)

Based on the foregoing, Dr. Ottesen's findings do not reflect actual evidence, but rather mere conclusions that do not overwhelm the other evidence in the record. Substantial evidence

in the record supports the ALJ's decision to give Dr. Ottesen's findings little weight. *See Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cr. 1988).

Giving little weight to Dr. Ottesen's opinions, the Court will consider the ALJ's evaluation of the 12.04 and 12.08 listings.

### Listing 12.04: Affective Disorders – Bipolar Disorder

When evaluating mental impairments, the ALJ employs a particular technique to: (1) Identify the need for additional evidence to determine impairment severity; (2) Consider and evaluate functional consequences of the mental disorder(s) relevant to [the claimant's] ability to work; and (3) Organize and present [the] findings in a clear, concise, and consistent manner. 20 CFR § 404.1520a(a). The first step in the technique requires a determination of whether the person has a "medically determinable impairment." 20 CFR § 404.1520a(b). To meet 12.04 Plaintiff must meet the requirements of paragraphs "A" and either "B" or "C" of the listing. *See Ahangari v. Astrue*, No. 07-CV-01869-REB, 2008 WL 4183492, *3 (D. Colo. Sept. 8, 2008).

The ALJ opinion does not discuss how Ms. Carlson meets the requirements of paragraph A. (Tr. 15.) Instead, the ALJ's opinion skips to paragraphs B and C. (*Id.*). The Regulations state that the ALJ's "written decision must incorporate the pertinent findings and conclusions based on the technique." 20 CFR § 404.1520a(e)(4); *See also Christian v. Astrue*, No. 3:10-CV-0455, 2011 WL 3348078, *4 (M.D. Tenn. Aug. 2, 2011). Without the findings as to paragraph A, this Court cannot evaluate whether substantial evidence supports the ALJ's findings on paragraph B or C because paragraphs B and C require that the problems in A result in the factors in paragraphs B or C.

If the Court "'could confidently say that no reasonable administrative fact finder, following the correct analysis, could have resolved the factual matter in any other way,'" then

the Court may find the error harmless. *Fischer-Ross v. Barnhart*, 431 F.3d 729, 733-34 (10th Cir. 2005). To determine whether the error, of not detailing the findings under paragraph A is harmless the Court looks to the other findings in the record. Paragraph A of Listing 12.04 requires the "[m]edically documented persistence, either continuous or intermittent, of one of the following:

> 1. Depressive syndrome characterized by at least four of the following:
>    a. Anhedonia or pervasive loss of interest in almost all activities; or
>    b. Appetite disturbance with change in weight; or
>    c. Sleep disturbance; or
>    d. Psychomotor agitation or retardation; or
>    e. Decreased energy; or
>    f. Feelings of guilt or worthlessness; or
>    g. Difficulty concentrating or thinking; or
>    h. Thoughts of suicide; or
>    i. Hallucinations, delusions, or paranoid thinking; or
>
> 2. Manic syndrome characterized by at least three of the following:
>    a. Hyperactivity; or
>    b. Pressure of speech; or
>    c. Flight of ideas; or
>    d. Inflated self-esteem; or
>    e. Decreased need for sleep; or
>    f. Easy distractibility; or
>    g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
>    h. Hallucinations, delusions or paranoid thinking; or
>
> 3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)[.]"

20 C.F.R. Part 404, Subpart 1, § 12.04(a).

As to depressive syndrome, any reasonable administrative factfinder would have found medically documented persistence of anhedonia and feelings of guilt or worthlessness. However, the ALJ must find four factors of depressive syndrome. While evidence exists in the

record of some of the others, the evidence is not such that no reasonable administrative factfinder could have resolved the matter differently.

Regarding manic syndrome, the medical evidence does not require a finding of any one of the factors, let alone three. Concerning bipolar syndrome some record evidence explicitly contradicts such a finding while some record evidence supports a finding. Therefore, this Court cannot say the lack of findings under paragraph A represent a harmless error.

Though evidence supports the ALJ's opinion, without knowledge of the underlying symptoms on which the ALJ relied, the Court cannot assess whether *substantial evidence* supports the finding that those symptoms did not result in two or more of the factors in paragraph B. Similarly the functional limitations of paragraph C must also result from the mental disorder identified in paragraph A. 20 C.F.R. Part 404, Subpart 1, § 12.00(A). The Court cannot assess whether or not the ALJ's finding that Ms. Carlson does not meet the requirements of paragraph C without analysis of paragraph A. Therefore the Court remands the matter for further findings.

### Listing 12.08: Affective Disorders – Personality Disorders

Like Listing 12.04, Listing 12.08 also requires that the functional limitations of the later paragraph result from the disorder identified in paragraph A of the listing. 20 C.F.R. Part 404, Subpart 1, § 12.08. Because the ALJ did not address paragraph A of Listing 12.08 in her opinion, (Tr. 15), the Court cannot assess whether or not the ALJ properly evaluated whether Ms. Carlson met the requirements of paragraph B of this listing. Because the Court remands the case for further findings on Listing 12.04, it will not conduct the harmless error analysis on 12.08 but will instead request the ALJ to make further findings on this paragraph as well so that any review of the decision considers the intended findings of the ALJ.

### CONCLUSION

After a complete review of the record and based on the foregoing, the Court REMANDS for further proceedings consistent with this opinion.

DATED this 13th day of March, 2013.

BY THE COURT:

_____
Evelyn J. Furse
United States Magistrate Judge